MacFarland & Dupré vs. Lehman, Abraham & Co.

a year after the institution of the suit an amended petition is filed, wherein she is alleged, for the first time, to be a married woman, and the court is asked to authorize her to defend the suit, and the order therefor is then entered but no notice of the order is served upon her, and no delay allowed her to prepare her defense—a default being taken against her so soon as the order was signed—and she never thereafter appears in the suit;

*Held,* that the wife was not a party to the suit.

APPEAL from the Seventeenth District Court, Parish of East Baton Rouge. *Sherburne,* J.

———

*Favrot & Lamon* for Plaintiff and Appellant.

*D. N. Barrow* and *Knox & Laycock* for Defendants and Appellees.

———

The opinion of the Court was delivered by TODD, J.

———

## No. 9459.

## MACFARLAND & DUPRÉ vs. LEHMAN, ABRAHAM & CO.

In this suit for damages for wrongful attachment, it appearing that, prior to the attachment, the financial embarrassments of plaintiffs were such as to necessitate the stoppage of their business unless they could obtain relief from some source; and it not appearing that there was any source from which such relief could be obtained, they cannot recover damages for breaking up of the business and loss of credit therein as occasioned by the attachment.

The sale of plaintiffs' rice mill, voluntary or forced, being inevitable, and they having tried in vain to find a purchaser before the attachment, and the forced sale thereof having been made after due advertisement and on twelve months credit, and no evidence being produced to show that anyone was or had been ready or willing to buy at a higher price, and none to show any deterioration in value resulting from the seizure, we are bound to accept the price bid at the sale as the criterion of its value, and to reject the demand for damages on that account.

Considering the open and honest dealings of plaintiffs and their faithful efforts to pay their creditors at every sacrifice, communicated to all interested and to defendants themselves, the latter's proceeding by attachment, on the charge of fraudulent intent, was peculiarly injurious and insulting to plaintiffs, and substantial damages are allowed therefor.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor,* J.

———

*Percy Roberts* for Plaintiffs and Appellees.

*White & Saunders* for Defendants and Appellants.

———

The opinion of the Court was delivered by

FENNER, J. This is an action for damages resulting from the wrongful issuance of an attachment, being the same writ of attachment which

was considered by us in the case of Lehman, Abraham & Co. vs. Mac-Farland & Dupré, reported in 35 Ann. 624.

In their petition herein, MacFarland & Dupré aver that they have suffered $30,000 actual damages from the attachment of which we have spoken. They itemize their claim as follows:

1. For lawyer's fees incurred by petitioners on account of
    said attachment ................................$   350 00
2. For printing brief in said suit....................    11 25
3. Paid stenographer for testimony taken by him........    64 75
4. Rent paid on building Nos. 141 to 149 South Peters street,
    from November 14, 1882, to January 25, 1883........   396 00
5. For loss of profits in their business caused by said illegal
    attachment during the term of said attachment and
    detention ........................................  8,000 00
6. For loss caused your petitioners by the forced sale of
    their said rice mill below its real value............  8,000 00
7. For the breaking up of their business, the destruction of
    their credit and commercial standing, loss of time,
    trouble and distress of mind, wholly and exclusively
    caused by said wrongful, illegal and malicious attach-
    ment and detention................................ 13,178 00
    ───────
    Making in the aggregate the sum of.............$30,000 00

There is no serious dispute as to the liability of defendants for the first four items, the respective amounts of which were fully proved, and were allowed by the judge a quo. He rejected the fifth item for loss of profits and the seventh item for breaking up of business, loss of credit, etc., and allowed the sixth item for loss on the forced sale of the mill, as claimed.

So far as the loss of profits and the breaking up of their business are concerned, we are constrained to sustain his rulings.

We cannot avoid the conclusion that the breaking up of their business and the consequent loss of profits resulted from the financial embarrassments in which plaintiffs were placed, entirely independent of the attachment.

They could not have been averted otherwise than by obtaining indulgence from their creditors, which the creditors refused to grant, or by a sale of the whole or a part of the mill, which they were unable to effect, and which, even if effected for the whole, would necessarily have terminated their interest in the concern.

Such was the clear acknowledgment of plaintiffs themselves in their defense of the attachment suit, as the excuse for their efforts to dispose of their property, and such was the theory upon which we maintained their defense.

Thus we said in our opinion: "The record shows that the defendant firm, owing to heavy losses sustained in speculation in rice, had become financially embarrassed and so badly crippled that their business could not longer continue. The partners, therefore, concluded to sell their mill for the purpose of meeting their obligations, and this intention was at once communicated to their heaviest creditors, including the plaintiffs in this suit. * * * The record not only fails to show any fraudulent design of defendants, but it proves conclusively an honest, honorable and persistent intention on the part of these unfortunate debtors to make any sacrifice necessary to the payment of all their debts and liabilities."

On these grounds we held that the attachment was wrongful, though, even then, by a divided Court.

We have carefully reviewed so much of the evidence in that case as was offered in this, and it satisfies us that the embarrassment existed to an extent incompatible with the continuance of the business in absence of relief, which was not forthcoming. The refusal of Maxwell & Peale and of Lehman, Abraham & Co. to extend the maturities falling due on Monday, November 13th, undoubtedly brought about a crisis in plaintiffs' business which necessitated its suspension until relieved.

They had no rice on hand and no money to buy with, and their mill must have remained idle unless they could buy rice for milling on credit. Their credit had undoubtedly been good; but their default in paying for defendants' rice sold on ten days' time, which they had already resold and of which they had received the price, together with approaching necessary defaults on similar transactions, must have paralyzed the highest credit. They fully recognized this fact; admitted, in advance of the attachment, that they were "frozen out," and fell back on the desperate alternative of selling an interest in their mill, or the mill itself.

Their claim that, but for the attachment, they could speedily have raised money by such a sale or otherwise, and that their business would then have gone swimmingly on, is sustained by nothing but their own asseverations, honestly believed no doubt, but supported by no proof that any one was willing to buy or to advance them money on any terms. It is true a Mr. Tisne had their proposition of sale under

consideration, but he had asked for further time, and he is not even produced as a witness to show what his determination would have been. Several other persons to whom the proposition had been offered had positively declined, and these embraced the persons most likely to desire such an investment.

We find nothing to satisfy us that plaintiffs could have found any means of extricating themselves from their embarrassment and of continuing the business. and, therefore, hold that the breaking up of their business and consequent loss of profits, the latter doubtful at best, were not attributable to the attachment.

The judge allowed as damages the sum of $7,700, the difference between $18,000, the estimated value of the mill, and $10,300, the price which it brought at the forced sale.

The sale was effected under a *fi. fa.* issued on a judgment obtained by Maxwell & Peale against the plaintiffs, under the following peculiar circumstances.

Maxwell & Peale were holders of a note having at the date of the attachment about six months to run to maturity. As soon as the attachment was levied, plaintiffs voluntarily substituted for the immature note one past due, on which Maxwell & Peale immediately brought suit and obtained judgment by default, without defense by plaintiffs. On this judgment *fi. fa.* issued, and the mill was seized and advertised for sale. By consent of parties, the leases of the property on which the mill was erected were offered at the same time, and the whole was advertised for sale on twelve months' credit. The property was adjudicated at $10,300 to the last and highest bidder.

We pretermit consideration of the questions as to whether such proceedings do not present serious features of a consent sale, and whether the attachment can be considered as the legal cause of the damage, if any, occasioned thereby.

Mr. Maxwell testifies he would not have sued if the attachment had not been levied. He could not have sued if the substitution had not been made. Other creditors have not testified that they would not have sued regardless of the attachment. It is very certain that Lehman, Abraham & Co. would have sued, whether they had attached or not. In absence of any proof of the ability of plaintiffs to consummate any arrangements to settle with their creditors and continue the business, we see no reason why other creditors should not have sued, and why Maxwell & Peale, if they had obtained the substitution, should not have done the same.

The evidence satisfies us that the sale of the mill, voluntary or forced,.

MacFarland & Dupré vs. Lehman, Abraham & Co.

was inevitable, unless plaintiffs could raise means to settle their indebtedness and continue the business. While professing great confidence in their ability so to do, they have pointed us to no source from which aid could have been obtained, except to a possible sale of an interest in the mill, which they had tried in vain to make, and they have failed to produce a single person who testifies that he would have given the price demanded or any price greater than that of the adjudication.

Testimony as to the cost of the mill and opinions as to its value are, therefore, ineffective.

If it were clear that, but for the attachment, plaintiffs could have held and used their mill, and that no sale would have taken place, we might accept the value *to them* as the standard by which to measure the loss occasioned by the forced sale.

But if a sale was necessary, the criterion of value is obviously the price that can be obtained. Now we have searched the record in vain for any evidence showing that anyone was ready or willing to pay more for the mill than it brought under the hammer.

The terms of the public sale were of the most advantageous character, well calculated to induce purchasers at the fullest price.

There is no evidence of any injury or deterioration to the property during the seizure, or of any reason why it should not have brought as much at public sale as otherwise. It is not like cotton or dry goods, which have a certain market value at which they are readily convertible into cash, and which, when sacrificed at a forced sale below their value, afford a ready measure of the loss occasioned thereby.

Hence the following cases quoted do not apply: Duperron vs. Van Winkle, 4 Rob. 41; McDaniel vs. Gardner, 34 Ann. 34; Frank vs. Chaffe, Id. 1205.

On the whole we are compelled to conclude that the allowance for alleged loss on the sale of the mill was error.

It only remains to consider the damages claimed for injury to their commercial standing as individuals, and loss of time, trouble and distress of mind occasioned by the wrongful attachment.

Evidence on these points is scanty, but even if fuller, could have thrown little light not reflected from the very facts of the case.

We have never seen an example of debtors who were making more faithful and earnest efforts to pay their creditors, and who were more determined to do so even at the heaviest sacrifice. Their purposes and motives were thoroughly honest, their action was open and above board, communicated to all interested and to the defendants them-

selves. Under these circumstances the action of the latter in taking the attachment upon an affidavit that plaintiffs were seeking to defraud their creditors and place their property beyond their reach, was insulting and aggravating in the extreme, and well calculated to wound and incense them. Necessarily, also, it occasioned trouble and loss of time, and cast injurious imputations upon their character as merchants and honest men.

We think they are entitled to substantial reparation for these injuries, which we shall fix at one thousand dollars.

It is therefore ordered, adjudged and decreed that the judgment appealed from be amended by reducing the principal sum allowed therein from $8,522 to $1,822, and that as thus amended the same be now affirmed, appellees to pay costs of appeal.

Todd, J. dissents from so much of the opinion and decree as allows more than $822.